Gwendolyn D. DAVIS, on behalf of
Billy Allen Dudley, Petitioner,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES Respondent.

No. 91–593V.

United States Court of Federal Claims.

Oct. 9, 2002.

Paul S. Dannenberg, Huntington, VT, for petitioner.

Glenn A. McLeod, Washington, DC, for respondent.

## OPINION

WILSON, Judge.

Petitioner seeks review of a special master decision denying compensation under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), *as amended*, 42 U.S.C. §§ 300aa–11 to –34 (1994 & Supp. V 1999). Also pending before the Court is petitioner's motion to amend the motion for review and motion to file the well-child exam of Adam Dudley. For the reasons set forth below, the Court grants petitioner's motion to amend her motion for review, denies petitioner's motion to file the well-child exam of Adam Dudley, and reverses and remands the special master's decision.

## BACKGROUND

### I. Facts

Billy Allen Dudley was born on October 8, 1983. On October 28 and December 2, 1983, Billy was examined by his pediatrician during routine well-child check-ups and no health problems were noted. Billy received his first diphtheria-pertussis-tetanus (DPT) vaccination during his second visit. Two days later, on December 4, 1983, Billy's mother put him in his crib for a nap at approximately 4:00 p.m. At about 5:00 p.m., she checked on him and found him not breathing. Billy's father unsuccessfully attempted resuscitation, and Billy was rushed to the hospital by ambulance. Medical personnel were unable to resuscitate Billy in the ambulance or at the hospital. The medical examiner's autopsy identified the cause of death as "crib death," also known as Sudden Infant Death Syndrome or "SIDS." *Davis v. Sec'y of Health and Human Servs.*, No. 91–593V, slip op. at 1–2 (Fed.Cl.Spec.Mstr. Feb. 2, 2001).

Petitioner's claim for compensation under the Vaccine Act alleges that Billy died from vaccine-related encephalopathy and/or hypotensive-hyporesponsive shock collapse within three days of receiving his DPT inoculation. At the hearing before the special master, petitioner described Billy's symptoms as she remembered them during the time between his inoculation and death. Petitioner reported that following the vaccination Billy slept more than normal, and that when he was awake he was very irritable. Petitioner added that Billy did not respond well when played with by his older brother. She also stated in an affidavit that "within several hours" after his vaccination, Billy "turned white as a ghost." According to the petitioner, Billy ate less after the inoculation, his eyes looked "spacey," and he was "limp" when awake and wouldn't smile. *Davis*, slip op. at 2.

The contemporaneous records contain only three notations concerning Billy's health and behavior during the time period just prior to his death. First, the emergency room record reports that the "[b]aby has been congested." Second, the autopsy report, under the category of "circumstances of death," notes that prior to being put down for his nap on the day of his death, Billy "had been well previously." Finally, the police report regarding Billy's death noted that petitioner had indicated at the hospital that "the baby appeared

normal that day."[1] *Davis*, slip op. at 5.

Petitioner's two expert physicians, geneticist Mark Geier and pathologist John J. Shane, testified that Billy suffered an encephalopathy and/or a hypotonic-hyporesponsive episode ("HHE") during the period between his inoculation and death, and that these "Table Injuries" caused his death. Both experts testified that their opinions were based in part upon the representations of Billy's mother as to the infant's behavior during the period between the inoculation and the death. (Transcript of December 6, 2000 hearing (hereafter abbreviated 2–Tr.) at 7–8, 22, 119–120, 130.) Both experts also relied on evidence from the autopsy report, including the weight of Billy's brain, and the fact that Billy had cerebral edema. In addition, Dr. Shane testified that the autopsy report lacked certain findings he would expect to see in a SIDS case, including the presence of periadrenal brown fat, astrogliosis of the brain stem, edema in the tracheobronchial tree, and an abnormal pathological degree of extramedullary hematopoeisis. (2–Tr. at 120–25, 130–31, 135, 143–44, 146–47, 201, 205.)

Respondent's expert physicians, pediatric neurologist Walter Molofsky and pediatric pathologist Enid Gilbert–Barness, opined that the evidence did not support the conclusions that Billy suffered either an encephalopathy or a hypotonic-hyporesponsive episode, and that Billy's death was caused by his DPT vaccination. Rather, respondent's experts testified that Billy's death was caused by SIDS.

The special master rejected the petitioner's theory for two primary reasons. First, he found that petitioner's experts relied on a questionable description of Billy's alleged symptoms. Finding "considerable reason to doubt the accuracy of [the mother's] testimony," the special master concluded that the petitioner was not intentionally falsifying her testimony, but that her recollection may have been influenced by the passage of time as well as by psychological factors. The special master also found significant that the records made at the time of Billy's death did not contain any indication that Billy manifested the symptoms alleged by petitioner. *Davis*, slip op. at 5.

Second, the special master found the respondent's experts' testimony to be "substantially more persuasive" than that of petitioner's experts. *Davis*, slip op. at 6. The special master concluded that even if petitioner accurately described Billy's symptoms, the petitioner failed to demonstrate a Table Injury based on the medical record. The special master found the testimony of respondent's expert Dr. Gilbert–Barness particularly persuasive. She opined that the cerebral edema in Billy's case was "mild," was consistent with SIDS deaths, and was inconsistent with a death caused by cerebral edema or encephalopathy. (2–Tr. at 162–63.)

The decision also notes that the special master found respondent's experts to possess superior credentials. "[N]either [of petitioner's experts] appear to have any special expertise in either pediatrics or neurology," he noted, and "as to the specific issue here—i.e., analysis of an *infant* whose death was found to be an example of *SIDS*—Dr. Shane's credentials are vastly outweighed by those of Dr. Gilbert–Barness." *Davis*, slip op. at 7 (emphasis in original).

## II. Statutory Provisions

The National Vaccine Injury Compensation Program makes awards to individuals who have suffered injuries or deaths caused by certain vaccines. A claimant may establish a prima facie case for compensation in one of two ways: by meeting the requirements of the Vaccine Injury Table or by introducing proof of actual causation. 42 U.S.C. § 300aa–11(c)(1)(C)(ii); § 300aa–14; *See Shalala v. Whitecotton*, 514 U.S. 268, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995). Petitioner pursued both theories of causation at the proceeding before the special master.

Under the "on-Table" theory, a petitioner establishes a prima facie case for compensation by proving the existence of three essen-

---

1. The slip opinion mistakenly states that petitioner's statement was made to the emergency room physician, when in fact the record indicates that she made this statement to a police officer investigating the death. See discussion, *infra*.

tial elements: that a vaccine listed in the Vaccine Injury Table was administered; that an injury listed in the Table occurred; and that the first symptoms of the injury appeared within the time frame listed in the Table. § 300aa–11(c)(1)(C)(i). Upon such a showing, causation is presumed and the petitioner is considered to have made a prima facie case of entitlement to compensation. The government may rebut the presumption of an on-Table injury by showing by a preponderance of the evidence that a "factor unrelated" to the vaccine was the actual cause of the injury or death. *See* § 300aa–13(a)(1)(B); *Shalala v. Whitecotton,* 514 U.S. at 270–71, 115 S.Ct. 1477. Alternatively, under the actual causation theory, a petitioner establishes a prima facie case of entitlement to compensation by showing that the "off-Table" injury (i.e., an injury not set forth in the Table) was "caused-in-fact" by the vaccine. *See* §§ 300aa–13(a)(1)(A), 300aa–11(c)(1)(C)(ii).

Two of the "Table Injuries" listed for the DPT inoculation are "encephalopathy" and "hypotonic-hyporesponsive collapse." §§ 300aa–14(a)(1)(B), 300aa–14(a)(1)(C). The Vaccine Act defines encephalopathy as "any significant acquired abnormality of, or injury to, or impairment of function of the brain," frequently manifested by "focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions." § 300aa–14(b)(3)(A).[2]

## ANALYSIS

### I.  Standard of Review

Upon review of a vaccine compensation decision by a special master, the Court is authorized to:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the Court's direction.

42 U.S.C. § 300aa–12(e)(2) (1994). According to the Federal Circuit:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed ... under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard.

*Saunders v. Sec'y of Health and Human Servs.,* 25 F.3d 1031, 1033 (Fed.Cir.1994) (quoting *Munn v. Sec'y of Health and Human Servs.,* 970 F.2d 863, 870 n. 10 (Fed.Cir. 1992)).

■ Petitioner's motion for review alleges that the special master (1) incorrectly applied the law when evaluating the evidentiary record, and (2) erred in making a determination of the relevant facts. The Court must reverse any determination in which the special master misinterprets or misapplies the law, unless the error would not affect the outcome in the case. *Wagner v. Sec'y of Health and Human Servs.,* 37 Fed.Cl. 134, 137 (1997). Review of the special master's statutory application is conducted *de novo* by this Court, to determine if the legal conclusions are "in accordance with law." *Saunders v. Sec'y of Health and Human Servs.,* 25 F.3d 1031, 1033 (Fed.Cir.1994). This Court's evaluation of the special master's treatment of the facts under the arbitrary and capricious standard is "well understood to be the most deferential possible." *Munn,* 970 F.2d at 870. The decision of the special

---

**2.** "Signs and symptoms such as high pitched and unusual screaming, persistent inconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy." § 300aa–14(b)(3)(A). Symptoms of hypotonic-hyporesponsive collapse may include "decrease

or loss of muscle tone, paralysis (partial or complete), hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest." § 300aa–14(b)(1).

master may be deemed arbitrary and capricious if the special master:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines v. Sec'y of Health and Human Servs.,* 940 F.2d 1518, 1527 (Fed.Cir.1991) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). When applying the arbitrary and capricious standard, a reviewing court is not empowered to substitute its own judgment for that of a previous trier of fact. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Rather, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

## II. Motion to Amend Motion for Review and Motion to File Well–Child Exam of Adam Dudley

As a preliminary matter, the Court grants petitioner's motion to amend her motion for review, and denies petitioner's motion to file the well-child exam of Adam Dudley. RCFC Appendix B (Vaccine Rules) does not contemplate amendments to Motions for Review and Objections. However, RCFC 15(a) allows a party to amend its pleading "once as a matter of course at any time before a response is served." Pursuant to RCFC 15(a) and Vaccine Rule 1, which states that the RCFC will apply unless inconsistent with the Vaccine Rules, petitioner's motion to amend is granted.

■ Petitioner's motion to file the well-child exam of Adam Dudley on review is denied. In a vaccine case, the Court is limited to reviewing the record in accordance with 42 U.S.C. § 300aa–12(e) (1994), and is not at liberty to review the evidence *de novo. Turner v. Sec'y of Health and Human Servs.,* 268 F.3d 1334 (Fed.Cir.2001).

■ Respondent argues that the Court is also precluded from considering the evidence by Vaccine Rule 8(f), which provides, in pertinent part, that "[a]ny fact or argument not raised specifically in the record before the special master shall be considered waived and cannot be raised by either party in proceedings on review of a special master's decision." RCFC App. B, Vaccine R. 8(f). Petitioner argues that the additional evidence is not waived because the fact of Adam Dudley's exemption from vaccination was raised in the proceedings below. In the hearing before the special master, petitioner's counsel specifically questioned petitioner about Adam Dudley's reactions to and exemptions from immunization. (Transcript of November 2, 2000 hearing (hereafter abbreviated 1–Tr.) at 26). Petitioner testified that Billy's younger brother Adam received a test dosage of the DPT vaccination and "became very irritable, cranky, screaming, [with] high fevers." (1–Tr. at 27.) In addition, the Immunization Exemption Notes for both Adam Dudley and brother Devin Davis were filed with the special master. (*See* 1–Tr. at 26–31.)

Petitioner further argues that respondent has waived any objection by specifically requesting the well-child exam. According to petitioner, at the first hearing respondent requested that petitioner file the immunization records for Devin Davis (*see* 1–Tr. at 52), and after the hearing respondent contacted petitioner and requested, among other things, "the medical record concerning immunization and any reactions for Adam Dudley." Pet'r Resp. at 5. However, those records were evidently not made available until after the expert hearing.

The Court agrees with petitioner that the *issue* of sibling sensitivity is preserved because it was raised and documented below. However, consideration of new evidence on review is precluded because the Court of Federal Claims does not function as the fact finder in vaccine cases. As the government points out, admission of the well-child exam on review would deprive the respondent of clarification by the physician who made the record and of the opportunity to cross-examine expert witnesses about the evidence.

Despite the existence of expert and fact witness testimony about the issue of sibling sensitivity (1–Tr. at 26–32, 2–Tr. at 31–32), the special master's decision is silent as to its significance. In conjunction with an error in the special master's application of the law, discussed below, this omission leads the Court to reverse and remand the decision for further consideration of the evidence, in addition to the newly obtained well-child exam of Billy's brother, along with any additional relevant testimony related to this document.

### III. Motion for Review

■ Petitioner argues that the special master erred as a matter of law by allowing respondent to "rebut the presumption created by statute with an unexplained disease process," in other words, by accepting respondent's evidence of SIDS. The government responds that the special master found that petitioner failed to establish a prima facie case of a Table Injury, and therefore, no rebuttable presumption existed; thus, no error in law occurred.

The Vaccine Act provides that compensation will be denied where there is a preponderance of evidence suggesting that death is caused by "factors unrelated" to the administration of the vaccine. § 300aa–13(a)(1)(B). However, an inquiry into "factors unrelated" to the administration of the vaccine is only necessary after the petitioner has established a prima facie case for a Table Injury; in other words, after "the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition." § 300aa–13(a)(1)(A); *Cucuras v. Sec'y of Health and Human Servs.*, 993 F.2d 1525, 1528 (Fed.Cir.1993).

The examination of evidence under these two provisions of the statute have been "collapsed" into a single inquiry for some non-Table vaccine cases (where petitioner argues that the vaccine was the "actual cause" of a non-Table injury). *See Johnson v. Sec'y of Health and Human Servs.*, 33 Fed.Cl. 712, 721 (1995). However, this practice constitutes reversible error in this case because the statute expressly prohibits consideration of "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, fac-

tor, injury, illness, or condition." § 300aa–13(a)(2)(A); *See Knudsen v. Sec'y of Health and Human Servs.*, 35 F.3d 543 (Fed.Cir. 1994); *Koston v. Sec'y of Health and Human Servs.*, 974 F.2d 157 (Fed.Cir.1992). As the Court noted in *Hossack v. Sec'y of Health and Human Servs.*, 32 Fed.Cl. 769, 771, fn. 4 (1995),

> [a]lthough HHS continues to raise the SIDS diagnosis as a tool to thwart petitioners' case, such a diagnosis can neither prevent petitioners from establishing their prima facie case, nor serve as any kind of defense or alternative cause of injury due to factors unrelated to the administration of the vaccine. Special masters have consistently held that SIDS is an idiopathic, unexplained diagnosis, and as such cannot defeat a petitioner's established case. (citations omitted)

By considering respondent's proof of an unexplained, idiopathic alternative cause for plaintiff's injury (in this case, SIDS), the special master shifted the burden to the petitioner by "forc[ing] her to disprove the causal effects of a condition ... that the government could not rely on as a defense." *Wagner v. Sec'y of Health and Human Servs.*, 37 Fed.Cl. 134, 139 (1997).

The preponderance of evidence requirement imposed by the Vaccine Act is a "very hospitable" standard in that "petitioners' proof need only 'tip the scale' by the slightest of evidentiary margins." *McClendon v. Sec'y of Health and Human Servs.*, 24 Cl.Ct. 329, 333 (1991). By both implicitly and explicitly weighing petitioner's evidence for Table Injuries against the possibility that Billy's demise was a result of SIDS, the special master effectively "raised the bar" beyond the "preponderance" standard in the Vaccine Act.

Attempting to distinguish the case law barring SIDS as a defense, the special master reasoned that "petitioners here *have failed to demonstrate a 'Table Injury' in the first place,* so that there is no need even to consider whether Billy's death was 'due to factors unrelated.'" *Davis,* slip op. at 8, fn. 8 (emphasis in original). However, his analysis of petitioner's proof of a Table Injury is so intertwined with his consideration of respondent's evidence of SIDS that it is impossible

to conclude that absent consideration of impermissible evidence of SIDS, the special master would have denied petitioner's claim.

Moreover, the special master noted that he did not "find it in any way inconsistent ... with the statute, that, in initially deciding *whether the petitioner has proved that a Table Injury occurred*, the special master [took] into account the fact that so many infants do die suddenly and for no apparent reason, in the phenomenon known as SIDS." *Id.* According to the special master, "ignor[ing] this fact would be illogical" because plaintiff's experts "rely upon the fact of the sudden unexplained death to be a part of their reason for concluding that an encephalopathy occurred." *Id.* However, the Vaccine Act's plain language and settled case law make clear that the special master's consideration of evidence of SIDS in evaluating whether petitioner established a prima face case of a Table Injury contravenes the statute's bar against idiopathic evidence and is contrary to law.

The special master's conflation of the two prongs of Table Injury analysis is particularly evident in his evaluation of competing expert testimony on the severity and cause of cerebral edema. Cerebral edema is defined as "brain swelling due to increased volume of the extravascular compartment from the uptake of water in the neuropile and white matter." STEDMAN'S MEDICAL DICTIONARY (27th ed.2000). Both petitioner's and respondent's experts agreed that increased brain weight may result from cerebral edema. (2–Tr. at 17, 162.) They also agreed that autopsy slides of Billy Dudley's brain revealed microscopic evidence of cerebral edema. (2–Tr. at 120–121, 163–164.)

The special master found the testimony of respondent's expert Dr. Gilbert–Barness particularly persuasive on the severity of Billy's cerebral edema. *Davis*, slip op. at 6. The special master relies on Dr. Gilbert–Barness' statement that it is typical for the brain weight of SIDS victims to be heavier than that found in the standard reference tables, as well as "an article [by a SIDS expert] ... confirm[ing] that 'increased brain weight' was typical of SIDS deaths." [3] *Davis*, slip op. at 7. This evidence was used to bolster the argument that the degree of cerebral edema in this case was "mild," as Dr. Gilbert–Barness testified. Therefore, to prove that Billy's edema was not "mild," but in fact was severe enough to be a symptom of encephalopathy, the petitioner had to disprove the hypothesis that Billy died of SIDS (which implies *a priori* a larger than average brain weight, according to Dr. Gilbert–Barness). Whether SIDS is an alternative explanation for the evidence of cerebral edema and increased brain weight as Dr. Gilbert–Barness claims should be irrelevant to the special master's consideration of whether petitioner demonstrated that Billy had an encephalopathy, defined by the Act as a "significant acquired abnormality of, or injury to, or impairment of" his brain. § 300aa–14(b)(3)(A). Rather, on remand, the special master must address whether the evidence of cerebral edema and increased brain weight, in combination with other evidence, is sufficient to demonstrate a prima facie case of a vaccine-related injury.

■ Petitioner also contends that the special master's decision omits reference to several issues or facts relevant to the determination of whether the petitioner established a prima facie case under the statute. A ruling may be considered "arbitrary and capricious" if the decision "entirely failed to consider an important aspect of the problem" at hand. *See Hines v. Sec'y of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed.Cir.1991) (quoting *Motor Vehicle Mfrs. Ass'n. v. State*

---

**3.** Petitioner correctly points out in her motion for review that Dr. Gilbert–Barness's testimony that SIDS is commonly associated with cerebral edema and an increase in brain weight does not represent medical consensus. There is evidently disagreement within the medical community as to the commonality of this association. For example, the article cited by the special master notes that "Kinney states quite specifically that cerebral edema is found only in a small propor-

tion of SIDS victims." On cross-examination, Dr. Gilbert–Barness testified that "that's [Kinney's] opinion," but makes no other refutation of this point. (2–Tr. at 190.) For the reasons discussed *infra*, this inconsistency is largely irrelevant, since the essence of this case is whether the evidence for encephalopathy petitioner's present is sufficient to establish an on-Table Injury for the purposes of the Vaccine Act (on its own terms, not vis-à-vis SIDS).

*Farm Mutl. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Most significantly, petitioner argues that the special master ignored evidence of the extent and severity of Billy's cerebral edema. The record reveals a significant disagreement between the experts about Billy Dudley's autopsy brain weight that is not reconciled by the special master. Billy's autopsy brain weight of 603 grams is significantly heavier than the 500 gram average brain weight for a two month old cited by both petitioner's and respondent's experts. Petitioner contends that Dr. Gilbert–Barness admits that an abnormally large brain weight may constitute evidence of severe edema, although she doubted that Billy's brain weight was abnormal. (2–Tr. at 186.) Instead, she testified that Billy's autopsy brain weight was subject to "a good deal of question," (2–Tr. at 186), and that "the brain weights in the reference tables are erroneous." (2–Tr. at 166.) Her contention that Billy's autopsy brain weight was questionable is subject to equivocation. Dr. Gilbert–Barness and petitioner's expert Dr. Shane disagree over whether standard pathological practice is to weigh an infant's brain before or after fixation, and over what effect fixation has on the autopsy brain weight. (2–Tr. at 139–143, 166–170.) However, Dr. Gilbert–Barness ultimately conceded that the pre-fixation weight is "probably the most accurate," and admits that the brain in this case "may have been weighed before [fixation]." (2–Tr. at 211.) How Billy Dudley's brain was handled during autopsy and whether it was weighed before or after fixation may be subject to confirmation by the medical examiner who performed the autopsy. The essential question to answer, however, is whether a 603 gram brain weight is a substantial departure from a reasonable baseline brain weight, and whether it establishes a prima facie case that Billy was encephalopathic.[4] For the reasons discussed above, this question must be answered without reference to testimony about SIDS.

■ Although raised during the proceeding, the issue of sibling sensitivity as a circumstantial indicator of a vaccine injury is also not discussed in the special master's decision. Petitioner's description of the adverse reactions to DPT vaccinations allegedly suffered by Billy's siblings included irritability, screaming, and fever or high fever. (1–Tr. at 27–28, 31.) Petitioner's expert Dr. Geier testified that families with a history of severe reactions to DPT have a fourfold increase in the chances of having a severe reaction in other children in the family. (2–Tr. at 31.) Respondent replies that the symptoms of the two siblings were common and not "severe," and that in any case the special master "found, based upon the record as a whole, that Billy did not, in fact, suffer a serious vaccine reaction, even assuming the accuracy of petitioner's testimony." Resp. Br. at 15. It is unclear from the decision whether the special master evaluated this testimony, or made a determination regarding the significance of his siblings' reactions in Billy's case. Since this issue is relevant to petitioner's establishment of a prima facie case, the special master should assess or reassess the importance of this evidence on remand.

Finally, petitioner argues that the special master's decision relies on a factual error. The decision notes that petitioner told the emergency room physician that Billy had "appeared normal that day," when in fact that statement had been made to a Vermont State Police Trooper. *Davis,* slip op. at 5. According to the police report:

> Dr. Mark Keller was the emergency room doctor at the time and he pronounced the baby dead at 1737 hours. This officer interviewed both the father and mother at

4. Petitioner also argues that using the average brain weight to establish a baseline for the severity of Billy's cerebral edema ignores "the medical findings" that his "head circumference was in the 25th percentile" for his age. Pet'r Mot. for Review and Objections at 2. Petitioner's experts testified that a smaller than average head circumference typically implies a smaller than average brain weight, which would support their theory that Billy's cerebral edema was severe. (2–Tr. at 28, 125.) However, Dr. Gilbert–Barness argued that "[y]ou can't always correlate the brain weight with the head size." (2–Tr. at 212.) The special master's decision did not examine this question in sufficient detail to establish a baseline for the purpose of comparison with Billy's brain weight.

Kerbs Hospital, learning what transpired at their residence (see M.O. for details). The mother further advised that the baby appeared normal that day.

(Pet'r filing of Jan. 11, 2000 at 27b.) Petitioner testified that at the time she made that statement, she was "scared" and she "might have said it to get [the officer] to leave me alone." (1–Tr. at 40–41.) She explained that she "was afraid of being charged with murder and therefore felt compelled to indicate that her child had been well previously when in fact he had been exhibiting the initial symptoms of encephalopathy." Pet'r Mot. for Review and Objections at 9. To the extent that the special master's decision regarding petitioner's credibility was informed by this factual error, on remand he should correct the error and assess the impact of her claim of duress on his determination regarding her credibility.

## CONCLUSION

For the reasons discussed above, petitioner's motion to amend is GRANTED; petitioner's motion to file the well-child exam of Adam Dudley in this Court is DENIED; and the special master's decision is REVERSED and REMANDED for additional fact finding and reevaluation of the evidence of a Table Injury in accordance with the burden shifting provisions of the Vaccine Act.

**IT IS SO ORDERED.**